UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **INDICTMENT** |
| Plaintiff, ) | |
| ) | 18 U.S.C. § 1343 |
| v. ) | 18 U.S.C. § 981(a)(1)(C) |
| ) | 28 U.S.C. § 2461(c) |
| TAKARA HUGHES, ) | |
| Defendant. ) | |

The UNITED STATES GRAND JURY charges:

### General Allegations

At times material to this Indictment:

**The Defendant**

1. Defendant TAKARA HUGHES was a resident of Maplewood, Inver Grove Heights, and Saint Paul, in the State and District of Minnesota.

2. From at least in or about June 2020 through in or about July 2021, defendant HUGHES capitalized on the COVID-19 pandemic to exploit emergency funding for needy, eligible unemployed workers and small businesses by engaging in a fraud scheme to obtain and spend benefits and loan proceeds that defendant HUGHES knew that she, and others, were not entitled to receive. Defendant HUGHES used false and fraudulent pretenses, representations, promises, and concealment of material facts to apply for at least $1.9 million in pandemic-related unemployment benefits and small business loans for herself and others.



SCANNED
JUN 3 0 2022
U.S. DISTRICT COURT ST. PAUL

*Pandemic-Related Unemployment Benefits*

3. The Social Security Act of 1935 initiated the federal and state unemployment ("UI") system, which provided benefits to individuals who were unemployed for reasons beyond their control. The UI system's purpose was to lessen the effects of unemployment through cash payments made directly to laid-off workers, and to ensure that life necessities were met on a weekly basis while the workers seek employment. The UI system was administered through the states' respective workforce agencies, such as California's Employment Development Department ("EDD"), Minnesota's Department of Employment and Economic Development ("DEED"), and similar agencies in other states.

4. Beginning in or about March 2020 and continuing through in or about September 2021, the federal government provided significant supplemental UI benefits that flowed to and through the states to offset the historic need for unemployment benefits by the American workforce due to the COVID-19 pandemic. Through such legislation as the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") enacted in March 2020, the Consolidated Appropriations Act 2021, and the American Rescue Plan enacted in March 2021, the federal government extended and expanded these UI programs in a number of ways, including by: lengthening the eligibility period for UI benefits; increasing the amount of UI benefits individuals could receive; and extending UI to workers impacted by the COVID-19 pandemic who were not ordinarily eligible for unemployment benefits.

5. UI funds through these pandemic-related programs were received by state workforce agencies, such as California's EDD and Minnesota's DEED, from the United States Department of Treasury through a program known as the Automated Standard Application for Payments, which was an electronic system that federal agencies used to transfer funds to recipient organizations.

6. UI claimants were required to answer certain questions to establish their eligibility for UI benefits and to certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable or unavailable to work. Although various states' UI applications had their own format and content, they nonetheless generally required that the applicants certify certain information, such as, that the applicants provided true and accurate information, that the applicants were eligible to receive UI from a certain state, and that the applicants had not previously applied for UI from a different state. The state workforce agencies relied upon the information provided by UI claimants in determining eligibility for UI benefits.

7. One way in which some states provided UI benefits to claimants, such as California's EDD, was through the use of Bank of America-issued debit cards that were mailed through the U.S. Postal Service to claimants at the addresses provided in the UI claims. After claimants received their Bank of America debit cards, they could activate it online or over the phone and could use the card to withdraw cash and pay expenses. Alternatively, claimants could provide the state agency with a

bank routing number and bank account, and unemployment benefits were directly deposited to that account.

8. If a state workforce agency approved a UI claim, claimants were required to certify every two weeks via telephone or Internet, under penalty of perjury, that they remained unemployed and eligible to receive UI benefits. Upon receipt of that periodic certification, then the state workforce agency authorized and deposited payment to the claimants' debit cards, which, for California's EDD, meant Bank of America debit cards, or to their bank account.

*Pandemic-Related Loans to Small Businesses*

9. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

10. An additional source of funding authorized by the CARES Act, and subsequently, by the American Rescue Plan Act of 2021, was the authorization of forgivable loans to small businesses for job retention and certain other expenses, which included a program referred to as the Paycheck Protection Program ("PPP"). To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The

4

PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to certify, among other things, average monthly payroll expenses, which was used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation, such as a tax return, showing their payroll expenses.

11. A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. PPP loan proceeds were required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.

12. In addition, the SBA provided direct loans to applicants through the Economic Injury Disaster Loan (EIDL) program, which was also funded by such legislation as the CARES Act to help small businesses facing financial difficulties during the COVID-19 pandemic. EIDL funds were offered in low-interest rate loans, designated for specific business expenses, such as fixed debts, payroll, and business obligations. Eligible EIDL applicants must have suffered "substantial economic injury" from COVID-19 based on a company's actual economic injury determined by the SBA.

13. To qualify for an EIDL loan, applicants were required to submit applications to the SBA, generally through the SBA's website, wherein the applicant provided information including the business's: name, EIN (or social security number for sole proprietorships), gross revenues and cost of goods for the prior year, address, email, date of establishment, number of employees, and bank account information. Applicants were required to certify under penalty of perjury that the information provided in the EIDL application was true and correct.

## THE SCHEME TO DEFRAUD PANDEMIC-RELATED ASSISTANCE PROGRAMS

14. From at least June 2020 through at least in or around July 2021, in the District of Minnesota, and elsewhere, the defendant,

**TAKARA HUGHES**,

did knowingly and intentionally devise and execute a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

15. The purpose of the scheme and artifice to defraud was to obtain money and property from states, such as California's EDD and Minnesota's DEED, among others, as well as from the United States, in the form of UI benefits and small business loans by submitting fraudulent claims and applications.

16. As part of her scheme to defraud, defendant HUGHES filed fraudulent claims seeking UI benefits from states where she had no lawful basis to receive UI benefits because, in fact, she neither resided nor worked in those states. For example, while defendant HUGHES resided in Minnesota throughout 2020 and 2021, she

caused the fraudulent submission of claims to California's EDD, in which she falsely claimed, among other things, that she resided at an address in San Diego, California, and that she previously earned income as a "self employed hairstylist" in California, all of which defendant HUGHES knew was false. As a result of defendant HUGHES's false and fraudulent claims, California's EDD paid defendant HUGHES approximately $46,000 in periodic UI payments between approximately July 2020 and July 2021, during which time HUGHES actually resided in Minnesota.

17.  It was further part of defendant HUGHES's scheme that she unlawfully "double-dipped" by trying to obtain UI benefits from multiple states simultaneously. For instance, in or about September 2020, defendant HUGHES caused the submission of a fraudulent claim for UI to Louisiana's Workforce Commission at which time she was actually residing in Minnesota and was already fraudulently receiving UI benefits from California's EDD, all of which defendant HUGHES concealed. In her fraudulent claim to Louisiana, defendant HUGHES claimed she was entitled to UI because she had purportedly been employed while living at a residence in New Orleans, which she knew was false. Approximately one month later in October 2020, defendant HUGHES fraudulently applied for UI from Minnesota's DEED, and concealed her fraudulent receipt of UI benefits from California and her claim to Louisiana. As a result of defendant HUGHES's false and fraudulent claims, Minnesota's DEED paid defendant HUGHES approximately $5,500 in periodic UI payments between approximately May 2021 and July 2021. Approximately two days after she submitted her claim for UI benefits to Minnesota's DEED, on or about

7

October 11, 2020, defendant HUGHES fraudulently applied for UI benefits from the State of Washington's Employment Security Department. Despite her previous UI claims to California, Louisiana, and Minnesota to the contrary, defendant HUGHES claimed to Washington that she purportedly had not applied for or received UI benefits in another state within the last twelve months and that she had purportedly not worked in another state besides Washington within the prior 18 months.

18.     It was further part of defendant HUGHES's scheme that she also caused the submission of fraudulent applications for EIDL small business loans to the SBA that were based, among other falsehoods, upon fake revenue figures. For instance, defendant HUGHES caused the submission of fraudulent EIDL loan applications in or about June 2020, July 2020, and December 2020, which falsely claimed, among other things, that defendant HUGHES's cleaning service had gross revenues of approximately $52,000, $96,000, and $167,144, respectively, which she knew was false. All three of these fraudulent EIDL loan applications were denied.

19.     As an additional part of her scheme, defendant HUGHES fraudulently applied for PPP small business loans in March 2021 and May 2021 that were based, among other falsehoods, upon fake payroll information and bogus tax records to deceive lenders. More specifically, defendant HUGHES falsely claimed in her March 2021 PPP loan application that she was the sole proprietor of a business purportedly established in January 2018 in the "commercial and institution building construction," all of which defendant HUGHES knew was false. Defendant HUGHES supported her fraudulent PPP application with a bogus tax record, namely, an IRS

Schedule C tax form for tax year 2019, in which she falsely purported to be in "wholesale" with gross receipts or sales of $134,000. As a result of defendant HUGHES's false and fraudulent claims for a small business loan, the PPP paid her approximately $20,832.00 in loan proceeds in April 2021. Defendant HUGHES submitted another fraudulent PPP loan application in May 2021 seeking funds for "All Star." Defendant HUGHES submitted with her second PPP application what purported to be a 2020 Schedule C tax form, which claimed that she had gross receipts or sales of $91,198, all of which defendant HUGHES knew was false.

20. In addition to fraudulently obtaining pandemic-related benefits for herself, it was further part of defendant HUGHES's scheme that on behalf of others she fraudulently obtained pandemic-related funds in exchange for a fee that she charged, which varied but that was at times approximately $3,000. More specifically, defendant HUGHES submitted on behalf of others at least 40 false and fraudulent claims for UI benefits and at least 30 false and fraudulent applications for small business loans.

21. The various fraudulent UI applications and loan applications that defendant HUGHES submitted in the names of other claimants contained false and fraudulent representations, including but not limited to, that the claimants had worked for particular employers, had specific annual incomes, worked during particular time periods, worked in particular states, were self-employed in various occupations, or were laid off and had no work due to the COVID-19 pandemic but were otherwise available to work. Defendant HUGHES was aware that these claims

9

were false. Among other things, the claimants were either not previously working, employed, self-employed, or otherwise seeking new employment, in the manner she represented in the applications. Defendant HUGHES also knew that these applications regarding the claimants' employment and availability to work were false at the time they were made, or she otherwise lacked the knowledge and authority to make such representations regarding each claimant. For example, in at least one instance, defendant HUGHES caused the submission of a fraudulent EIDL loan to the SBA on or about June 30, 2020, in the name of an inmate incarcerated at a Minnesota prison.

22. Between June 2020 and July 2021, defendant HUGHES applied fraudulently for at least $1.9 million in pandemic-related funds. In all, defendant HUGHES caused the United States and multiple state agencies to pay out at least $1.2 to defendant HUGHES and others in the form of fraudulent UI benefits and small business loan proceeds.

## COUNTS 1-5
(Wire Fraud)

23. Paragraphs 1 through 22 are incorporated by reference as if fully set forth herein.

24. On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**TAKARA HUGHES,**

for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by

means of wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds, as described below:

| Count | Date of Wire (on or about) | Wire |
|---|---|---|
| 1 | June 24, 2020 | Electronic submission from Minnesota of an application for an EIDL loan for defendant HUGHES, which was routed through servers located outside of Minnesota. |
| 2 | June 28, 2020 | Electronic submission from Minnesota of an application for an EIDL loan by defendant HUGHES, for Individual A, an incarcerated inmate at a Minnesota prison facility, which was routed through servers located outside of Minnesota. |
| 3 | July 5, 2020 | Electronic submission from Minnesota of a claim for UI benefits to California's EDD for defendant HUGHES, which was routed through servers located outside of Minnesota. |
| 4 | August 7, 2020 | Electronic submission from Minnesota of a claim for UI benefits to California's EDD for Individual B, which was routed through servers located outside of Minnesota. |
| 5 | December 7, 2020 | Electronic submission from Minnesota of an application for an EIDL loan for defendant HUGHES, which was routed through servers located outside of Minnesota. |

All in violation of Title 18, United States Code, Section 1343.

### FORFEITURE ALLEGATIONS

25. Counts 1 through 5 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c).

26. Upon conviction of any of the offenses alleged in Counts 1 through 5, as set forth in this Indictment, defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable

to the violation, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

27. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                   FOREPERSON